UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT B. LOU,<br><br>        Plaintiff,<br><br>    v.<br><br>ACCENTURE UNITED STATES GROUP HEALTH PLAN, et al.,<br><br>        Defendants. | Case No. 22-cv-03091-HSG<br><br>**ORDER GRANTING THE ACCENTURE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION, AND TERMINATING AS MOOT BLUE CROSS BLUE SHIELD ILLINOIS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 51, 68, 69, 59 |

Pending before the Court is a motion for summary adjudication filed by Plaintiff, Dkt. No. 51, as well as cross-motions for summary judgment filed by Defendants Accenture LLP and Accenture U.S. Group Health Plan, Dkt. No. 68, and by Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois, Dkt. No. 69. The Court held a hearing on the motions, Dkt. No. 82, as well as an evidentiary hearing. Dkt. Nos. 90 (minutes), 93 (transcript). For the reasons described below, the Court **GRANTS** Accenture and the Plan's motion, **DENIES** Plaintiff's motion, and **TERMINATES AS MOOT** BCBSIL's motion and Plaintiff's Request for Judicial Notice, Dkt. No. 59.

### I. BACKGROUND

From April 2019 to December 15, 2022, Albert Lou ("Plaintiff") was employed by Accenture LLP ("Accenture") as a Managing Director. Dkt. No. 83 ("Joint Statement") ¶ 1. By virtue of his employment with Accenture, Plaintiff was eligible to enroll in the Accenture United States Group Health Plan ("the Plan") – an Accenture-sponsored medical insurance open to

employees, retirees, and eligible dependents. *Id*. ¶ 5. Plaintiff enrolled himself and his daughter, A.L., in health benefits through the Plan, selecting the preferred PPO Plan administered by Blue Cross and Blue Shield of Illinois ("BCBSIL"). *Id*. ¶ 6. During his employment with Accenture, Plaintiff filed claims for coverage of in-home skilled nursing care for A.L., who suffered from a rare genetic disorder known as Aromatic L-amino Acid Decarboxylase Deficiency and had a variety of complex medical needs. Dkt. No. 24 ("FAC") ¶ 7. BCBSIL paid out certain claims for coverage of A.L.'s in-home care, but not others. Joint Statement ¶ 8. To address the allegedly wrongful denial of claims for A.L.'s care, Plaintiff filed this lawsuit against Accenture, the Plan, and BCBSIL (collectively, "Defendants") on May 26, 2022 pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). Dkt. No. 1.

In November 2022, Accenture notified Plaintiff that his employment would be terminated as part of a group layoff. Joint Statement ¶¶ 10–11. In connection with his termination, Accenture provided Plaintiff a draft "Separation Agreement (General Release and Waiver of Claims)" ("Separation Agreement") on November 14, 2022 for his review. *Id*. ¶ 11; Hearing Exhibit ("Hrg. Ex.") 1 at 92–99.[1] Per Accenture's LLP Leadership Separation Benefits Plan ("the Separation Plan"), the draft Separation Agreement offered Plaintiff six months' salary, a variable cash benefit based on his years of service, a $12,000 COBRA payment, and outplacement services to support his job search. Joint Statement ¶¶ 9, 12. The draft Separation Agreement also included a General Release and Waiver of Claims, and provided Plaintiff 45 days to review and sign. *Id*. ¶¶ 13–14; Hrg. Ex. 1 at 92.

Following receipt of the draft Separation Agreement and related materials, Plaintiff communicated numerous times with Alexis Quach, an HR Partner for Accenture, and Erin Evans, Accenture's West Technology Human Resources Lead, in an effort to, among other things, exclude his ERISA claims from the Separation Agreement's General Release. Joint Statement ¶¶ 20–31. Accenture never agreed to revise the language of the General Release, or to make either of Plaintiff's other two proposed revisions concerning the amount of his severance payout and his

---

[1] The Court relies on the exhibit numbering that the parties certified to at Dkt. No. 92.

1  COBRA premium.  On February 24, 2023, after numerous extensions, Plaintiff signed the
2  Separation Agreement as originally offered.  *Id*. ¶ 32; Hrg. Ex. 7.  A day after doing so, Plaintiff
3  emailed Accenture articulating both his "understanding that the release contained in the severance
4  does not cover [this] lawsuit, or any claims against the health plan, or its claims administrator" and
5  his intent to dismiss "Accenture itself" from the lawsuit.  Joint Statement ¶ 34.  Because
6  Defendants viewed dismissal against the BCBSIL and the Plan as also warranted, they declined to
7  stipulate to only Accenture's dismissal.  *Id*. ¶¶ 36–38.

8  On June 19, 2023, Plaintiff filed a motion for summary adjudication on two issues.  Dkt.
9  No. 51.  His motion argues first that he did not release his ERISA claims when he signed the
10 Severance Agreement, and second that he is entitled to benefits for A.L.'s care under 29 U.S.C. §
11 1132(a)(1)(B) and (a)(3).  Dkt. No. 51 ("Lou MSA").  Defendants Accenture and the Plan
12 (collectively, the "Accenture Defendants") filed a cross-motion for summary judgment, arguing
13 that Plaintiff had released his ERISA claims and that his motion consequently must be denied.
14 Dkt. No. 68 ("Accenture MSJ").  Defendant BCBSIL also filed a cross-motion for summary
15 judgment, contending that because Plaintiff lacked standing and BCBSIL correctly administered
16 the Plan, it was entitled to judgment in its favor.  Dkt. No. 69 ("BCBSIL MSJ").  The parties
17 appeared on October 19, 2023 for a hearing on the motions, at which point the Court took them
18 under submission.  *See* Dkt. No. 82.  On February 26, 2024, the Court held an evidentiary hearing
19 concerning the Separation Release that Plaintiff signed, and heard testimony from plaintiff witness
20 Albert Lou and defense witness Erin Evans.  *See* Dkt. Nos. 90 (minutes), 93 (transcript).

21 **II.    LEGAL STANDARD**

22 Summary judgment is proper when a "movant shows that there is no genuine dispute as to
23 any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
24 A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*
25 *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence
26 in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*
27 But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from
28 the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

3

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

**III.   DISCUSSION**

Before reaching the substantive question of Plaintiff's entitlement to medical benefits under the Plan, the Court must consider whether Plaintiff released his ERISA claims against some or all Defendants when he signed the Separation Agreement in February 2023.  Both Plaintiff and the Accenture Defendants argue that this question can be resolved in their favor on summary judgment.  *See* Lou MSA at 21–26; Accenture MSJ at 13–22.  After careful consideration of Mr. Lou and Ms. Evans' testimony, the admitted exhibits, and the parties' briefing and supplemental filings, the Court finds that there is no genuine dispute of fact that Plaintiff waived his ERISA claims against all Defendants.  Accordingly, it declines to address the portions of Plaintiff and BCBSIL's briefing concerning Plaintiff's entitlement to benefits.

**A.   Release**

The parties agree on virtually all of the material facts surrounding the general release, *see generally* Joint Statement, but disagree as to whether the release was ultimately knowing and voluntary – and therefore effective at releasing Plaintiff's claims – under the relevant standard.

"A release is the abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced . . . and its effect is to extinguish the cause of action; hence it may be pleaded as a defense to the action."  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017, n.10 (9th Cir. 2012) (quotation omitted).  In other words, a release is "the act of giving up a right or claim to the person against whom it could have been enforced."  *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1084 (9th Cir. 2007) (quoting Release, Black's Law Dictionary (abridged 7th ed. 2000)). The parties appear to agree that in the context of ERISA, releases must be evaluated under a "heightened scrutiny" standard.  *See* Lou MSA at 21–22, Accenture MSJ at 14 (reciting standard for evaluating ERISA releases); *see also*

4

1   *Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1012 (9th Cir. 1997) (noting that in the context of
2   ERISA, releases "must withstand special scrutiny designed to prevent potential employer or
3   fiduciary abuse").
4       Courts therefore consider whether the release was "'knowing and voluntary' by examining
5   the totality of the circumstances." *See Rombeiro v. Unum Ins. Co. of Am.*, 761 F. Supp. 2d 862,
6   868–69 (N.D. Cal. 2010) (collecting cases). Relevant factors include:

> (1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver.

11  *Id.* (quotation omitted); *accord Schuman v. Microchip Tech. Inc.*, No. 16-CV-05544-HSG, 2023
12  WL 5498065, at *7 (N.D. Cal. Aug. 23, 2023) (applying six-factor test); *Gonda v. The*
13  *Permanente Med. Grp., Inc.*, No. 11-CV-01363-SC, 2015 WL 678969, at *3 (N.D. Cal. Feb. 17,
14  2015), *aff'd sub nom. Gonda v. Permanente Med. Grp.*, Inc., 691 F. App'x 397 (9th Cir. 2017)
15  (same); *Upadhyay v. Aetna Life Ins. Co.*, No. C 13-1368 SI, 2014 WL 186709, at *4 (N.D. Cal.
16  Jan. 16, 2014), *aff'd*, 645 F. App'x 569 (9th Cir. 2016) (same); *Parisi v. Kaiser Found. Health*
17  *Plan Long Term Disability Plan*, No. C 06-04359 JSW, 2008 WL 220101, at *4 (N.D. Cal. Jan.
18  25, 2008) (same).
19      Although the clarity of the agreement – the third factor – is the main one in dispute, the
20  Court will consider each factor in turn.

21      **i.**    **Plaintiff's Education and Business Sophistication**

22      There are no disputes of material fact regarding Plaintiff's education history and business
23  sophistication.  The parties agree that Plaintiff received a Bachelor of Science Degree from the
24  University of California-Berkeley in Mechanical Engineering, and subsequently held positions in
25  business management with IBM, Infosys, Kaiser Permanente, and eventually, Accenture.  Joint
26  Statement ¶ 2.  At Accenture, the parties agree that Plaintiff served as a Managing Director, a
27  management-level role that required him to "[a]dvise[] executive leadership teams of $110B+
28  organizations on how to achieve strategic business goals . . . [d]irect[] teams of up to 300+ . . .

1    [and lead a] product team," and for which he was paid an annual salary of $300,000.00.  *Id.* ¶¶ 1,

2    3.  Though he does not have any legal training, Plaintiff has accrued "a lot of experience

3    negotiating and interpreting contracts" through his various roles.  Transcript ("Tr.") 8:19–20.

4          Given that a highly educated person with extensive business expertise is well positioned to

5    understand and evaluate a Separation Agreement's terms and implications, Plaintiff's background

6    weighs in favor of finding a knowing and voluntary release.  *See, e.g.*, *Schuman*, 2023 WL

7    5498065 at *7 (evaluating plaintiffs' substantial level of educational and professional attainment

8    as factor tending to show that the release was entered into knowingly and voluntarily); *Gonda*,

9    2015 WL 678969 at *5 (same).

#### ii.    The Respective Roles of Plaintiff and Defendant in Determining the Provisions of the Waiver

12         There are no disputes of material fact regarding Plaintiff's efforts to secure revisions to the

13   Separation Agreement.  The parties agree that in the months before signing the Separation

14   Agreement, Plaintiff communicated by email and phone with Accenture on numerous occasions to

15   discuss revising the Separation Agreement's terms to (1) increase severance benefits, (2) increase

16   COBRA coverage, and (3) exclude his ERISA claims from the General Release.  *See* Joint

17   Statement ¶¶ 20-31.  Plaintiff testified that while Erin Evans told him on January 9, 2023 that

18   Accenture was unwilling to make the first two changes he requested because the Separation

19   Agreement "was a standard agreement that was given to everyone in leadership," she also

20   expressed a openness to "revisit[ing] the proposed revision to request number three [concerning

21   the ERISA carve-out]" once mediation in this case was complete – a sentiment reiterated in an

22   email following their call.[2]  *See* Tr. 17:25–20:19; Hrg. Ex. 4 at 3.  The parties also agree that the

---

[2] Though the Declaration of Erin Evans in Support of Accenture's MSJ sets forth a different narrative of the January 9, 2023 call in Paragraphs 20–22, *see* Hrg. Ex. 9 at 5, the Court finds that it was not credible on this point and determines that it does not create a genuine dispute as to the nature of the parties' January 9 communication.  The Court basis this determination on three things: (1) the credibility of Mr. Lou's testimony about the content of the January 9 call, (2) the consistency of that testimony with the January 9 email Ms. Evans sent to Mr. Lou following the call, *see* Hrg. Ex. 4 at 3, and with the January 30 email Mr. Lou sent to Ms. Evans, *see* Hrg. Ex. 10 at 3–4, and (3) Ms. Evans' own testimony, which effectively disavowed the description of the January 9 call presented in her declaration, *see* Tr. 79:14–80:1.  While Ms. Evans at times demurred that the declaration was "not a direct quote" or that she did not say "those exact words,"

Separation Agreement Plaintiff ultimately signed did not reflect the three revisions he proposed, Joint Statement ¶ 32, but that Accenture extended the consideration period (which the Separation Agreement itself defined as the 45 days after receipt) numerous times at Plaintiff's request.

The Court finds that this factor ultimately cuts both ways. On the one hand, Plaintiff's testimony that Accenture declined the changes he proposed regarding his separation payout and COBRA coverage due to the "standard" nature of the Separation Agreement suggests that Accenture was unwilling to make any changes to the terms. That said, other facts suggest that Accenture *was* open to certain modifications. For example, Accenture extended the 45-day consideration period (which was itself established by the Separation Agreement) numerous times at Plaintiff's request to allow the parties to discuss Plaintiff's proposed revisions. Accenture also deferred a decision on Plaintiff's ERISA-related requests until completion of the parties' mediation. Had Accenture been categorically opposed to making any changes to the Separation Agreement, its willingness to extend deadlines, repeatedly discuss Plaintiff's proposed revisions, and revisit certain decisions would be puzzling. The Court accordingly concludes that Accenture's eventual denial of Plaintiff's requests should not be conflated with a flat unwillingness to consider them, but that Plaintiff cannot fairly be said to have played any meaningful role in determining the provisions of the waiver. This factor is therefore neutral.

### iii. The Clarity of the Agreement

There are no disputes of material fact regarding the clarity of the agreement, but the conclusions to be drawn from these facts are very much disputed. The Court summarizes the pertinent undisputed facts as follows:

---

*id.*, the Court finds fully credible Mr. Lou's testimony that she did not say what Paragraph 22 reflects *in substance* in the call either. The Court places responsibility for the unreliability of this portion of the Evans Declaration on counsel for the Accenture Defendants: counsel should never submit a declaration from a witness unless the witness is completely confident in adopting it as 100% true as her own statement, under penalty of perjury. The Court takes a dim view of what appeared to be a coached effort to quibble about the "exact words" rather than straightforwardly acknowledging that the declaration was simply substantively inaccurate. And the relevant issue is not what *Ms. Quach* or anyone else had told Plaintiff before the call, or what message Ms. Evans "intend[ed] to have Mr. Lou receive," *id.* at 84:15-21, but instead what she actually *said* in the call, which was the subject matter of the declaration. Overall, the Court has no trouble concluding that the declaration was just inaccurate in its representations about the January 9 call, and counsel never should have put Ms. Evans in that position.

7

- The draft Separation Agreement (Hrg. Ex. 1 at 92–99) contained the following provisions:

    **General Release.** As a material inducement to Accenture to enter into this Agreement and as part of the consideration for the Separation Benefits offered to you, to which you agree you are not otherwise entitled, you are expressly agreeing to the general release and waiver of claims in this Section 3 (the "General Release and Waiver of Claims"). Under this General Release and Waiver of Claims, you hereby forever release, waive and discharge Accenture LLP, its parents, subsidiaries, divisions, affiliates, predecessors, successors and assigns, and all of their respective present and former directors, officers, partners, employees, representatives, fiduciaries, attorneys and agents ("Released Parties") from any and all claims of any nature whatsoever, known or unknown which you now have, or at any time may have had, against the Released Parties up to and including the date you sign this Agreement ("Claims"). This General Release and Waiver of Claims includes, without limitation, any Claims related to your employment, your activities on behalf of Accenture and its predecessors, parents, subsidiaries, divisions and affiliates, the termination and layoff of your employment, Claims of wrongful discharge, Claims for the payment of any salary, wages, bonuses and commissions, Claims of discrimination or harassment under the common law or any federal or state statute (including, without limitation, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Older Workers Benefit Protection Act, all as amended), Claims relating to the Company's intellectual property, confidential and proprietary information and trade secrets, Claims of misrepresentation, Claims of detrimental reliance, and all other statutory, common law or other Claims of any nature whatsoever. This General Release and Waiver of Claims does not apply to any Claims concerning a breach of this Agreement, any Claims arising after you sign this Agreement, or any Claims that cannot be waived as a matter of law. […].

    **Entire Agreement.** This Agreement constitutes the full understanding and entire Agreement between you and Accenture concerning this subject matter and supersedes any other agreements of any kind, whether oral or written, formal or informal concerning the subject matter of this Agreement . . . .

- On December 14, 2022, about a month after receiving the draft Separation Agreement, Plaintiff emailed Alexis Quach, an HR partner for Accenture, requesting three revisions to the Separation Agreement. *See* Hrg. Ex. 3 at 3–5.

8

Request #3, in relevant part, stated:

> I understand that my separation is unrelated to the ongoing health care action for my daughter's care. For this reason, I would like for the Separation Agreement to be clear that I will not be waiving or releasing that case. Therefore, I would like to request the addition of the following sentence to the end of Paragraph #3 under Section "3. General Release and Waiver of Claims" of the Separation Agreement:
>
>> This General Release and Waiver of Claims does not apply to any Claims under the Employee Retirement Income Security Act of 1974 (ERISA) and does not apply to any Claims concerning the Accenture United States Group Health Plan and the Blue Cross Blue Shield PPO Plan, an Accenture United States Group Health Plan Participating Medical Plan.

- On December 15, Ms. Quach responded to Plaintiff, informing him that she had raised his requests to Accenture's "greater HR team" and needed additional information about Request #3 concerning the proposed ERISA language. *See* Hrg. Ex. 3 at 2.

- On January 9, 2023, Ms. Evans and Plaintiff spoke on the phone. As discussed above, Ms. Evans informed Plaintiff that Accenture was unwilling to accommodate his first two requests and suggested revisiting his third (relating to ERISA) after mediation. Tr. 17:25–20:19. She followed up by email the same day, again stating that Accenture recommended "revisiting [Request #3], if necessary, pending the outcome of your January 12 mediation." Hrg. Ex. 4 at 3.

- On January 30, 2023, Plaintiff sent Ms. Evans an email that, among other things, re-raised Request #3. Hrg. Ex. 10 at 3–4.

- On February 2, 2023, Ms. Evans replied, stating in pertinent part: "In relation to your third outstanding point [concerning the ERISA language], Accenture is not willing to make any revisions to our separation agreement." Hrg. Ex. 2 at 4.

- On February 3, 2023, Plaintiff replied to Ms. Evans's email again requesting "time to chat about [Request] #3" and introducing Emily Nugent as the "attorney who ha[d] been helping [him] review the separation agreement." Hrg. Ex. 2 at 3. The

9

same day, Ms. Evans provided Plaintiff and Emily Nugent the contact information for Lisa Widdecke "to discuss point number three." *Id.* Ms. Nugent and Ms. Widdecke subsequently spoke (though Mr. Lou testified that he was unfamiliar with the substance of their call. Tr. 49:6–17.

- On February 24, 2023, Plaintiff signed the Separation Agreement as originally offered. Hrg. Ex. 7.
- On February 25, 2023, Plaintiff sent the following email to Ms. Evans, stating in relevant part (*see* Hrg. Ex. 5 at 3):

  > I'm writing to confirm that I executed my severance agreement earlier Friday, just after 3 pm PT. Based both upon the terms of the agreement, and the communications we received from Accenture's counsel in our pending ERISA health benefits lawsuit, it is my understanding that the release contained in the severance does not cover that lawsuit, or any claims against the health plan, or its claims administrator. We will, however, direct our attorneys to dismiss Accenture itself from the lawsuit.

- On February 27, 2023, Plaintiff's counsel sent the parties a proposed stipulation dismissing Accenture LLP with prejudice from the case. Dkt. No. 74-2. After numerous follow ups, BCBSIL responded and advised that the claims against BCBSIL should also be dismissed. Dkt. No. 68-1, Ex. 1 to the Declaration of Wesley Stockard in Support of Accenture's MSJ ("Stockard Decl."), at 5. Plaintiff's counsel responded that BCBSIL was "not a released party . . . ." *Id.*
- On March 27, 2023, the Accenture Defendants sent Plaintiff a letter requesting dismissal of all Defendants. Dkt. No. 68-1, Ex. 2 to Stockard Decl., at 8–9. Plaintiff's counsel responded that they would not "stipulate to dismiss any other parties or claims." Dkt. No. 68-1, Ex. 3 to Stockard Decl., at 11.

Based on this undisputed factual record, the Court concludes that the General Release not only objectively applied to Plaintiff's ERISA claims, but that Plaintiff subjectively understood that fact.

First, the Court observes that the language of the release is very broad, covering "any and

all claims of any nature whatsoever, known or unknown which you now have, or at any time may have had." Despite the broad scope, Plaintiff argues that its application to Plaintiff's ERISA claims was "not clear[] and unambiguous" because it did not specifically name ERISA claims as released. Dkt. No. 74 at 7. While it is true that district courts in this circuit have held that even broad releases can be ambiguous where they do not specifically reference ERISA or other health benefits, *see*, *e.g.*, *Rombeiro*, 761 F. Supp. 2d at 869, there is no bright line, precedential rule that mechanistically hinges an agreement's clarity on its recitation of the word "ERISA" (and certainly not one that reduces the holistic six-factor analysis to a referendum on whether ERISA is specifically referenced). Here, the Court finds significant that the General Release not only broadly covered "any and all claims of any nature whatsoever, known or unknown," but also specifically released "any Claims related to [Plaintiff's] employment." No party disputes that Plaintiff's participation in Accenture's health plan was "by virtue of" his employment with the company. *See* Joint Statement ¶ 5 ("Accenture employees, retirees, and eligible dependents can participate in the [Accenture health] Plan."). Plaintiff acknowledged in his testimony that his health claims were "related to" his employment with Accenture. Tr. 36:11–15.

      Notably, the language of the agreement is not the only thing that persuades the Court that Plaintiff's ERISA claims were clearly released: the parties' conduct does, too. In evaluating an agreement's clarity, courts consider the overall context and circumstances surrounding a separation agreement *as well as* its language. For example, in *Rombeiro*, after finding the "terms of the agreement unclear" for lack of specific reference to ERISA benefits, the court reasoned that this ambiguity was not subsequently dispelled since "[t]here was no discussion whatsoever concerning his disability claims" and "[h]e was not told, and he did not believe, that the documents he was asked to sign would in any way limit his rights to disability insurance." *Rombeiro*, 761 F. Supp. 2d at 869. Those facts contrast meaningfully with the ones in this case as recited above. A threshold distinction is the backdrop to the Separation Agreement: here, Plaintiff was actively litigating and mediating this ERISA action at the same time that he was reviewing and ultimately signed the Separation Agreement. Unlike in *Rombeiro* and other cases, where the terminated employee may not have considered the accrual of any ERISA claims at the

11

time of severance, here Plaintiff's ERISA claims were unquestionably top of mind as he considered the Separation Agreement.

It is therefore unsurprising that Plaintiff's conduct reflected his understanding that the Separation Agreement directly bore on his ERISA claims. In the months following his receipt of the draft agreement, Plaintiff requested at least three times that Accenture add language excluding his ERISA claims from the otherwise expansive release. Accenture denied all three requests. No party disputes this. While Plaintiff makes much of the fact that Accenture never *explicitly* told him that it was declining his proposed revision to the general release language because it expected a full release of claims, the Court finds that any ambiguity on this point could not credibly survive Accenture's repeated refusal to add language carving out Plaintiff's claims. This is especially true where, prior to signing the Separation Agreement, Plaintiff never expressed to Accenture his apparently privately-held view that the expansive language of the General Release did not actually apply to his ERISA claims. Tr. 50:10–18. Because Accenture was never told that Plaintiff held that view before he signed the agreement, the Court finds it entirely reasonable that it never elaborated on its declination to revise the agreement. In light of the ongoing ERISA action, the expansive language of the agreement, and Plaintiff's repeated efforts to carve out his ERISA claim, Accenture's consistent refusal to modify the General Release as Plaintiff requested most plausibly communicated its unwillingness to reserve Plaintiff's ERISA claims, not its unwillingness to clarify that Plaintiff's ERISA claims were already reserved. That Plaintiff went on, after signing the agreement, to express an "understanding" that his claims *were* reserved is therefore not credible. It is also in conflict with his subsequent offer to dismiss Accenture from his ERISA suit – a choice he explains as a "good faith" gesture, but one that most plainly reflects his understanding that "Accenture was a released party" in this ERISA action under the Agreement. Tr. 50:24–51:4.

On this factual record, after considering the language of and circumstances attendant to the Separation Agreement, the Court finds no basis on which a finder of fact could conclude that the General Release reserved Plaintiff's ERISA claims. Finding the Separation Agreement sufficiently clear, the Court therefore holds that this factor weighs in Defendants' favor.

#### iv. The Time Plaintiff Had to Study the Agreement

There are no disputes of material fact regarding the length of time Plaintiff had to consider the agreement. Accenture sent Plaintiff a draft Separation Agreement on November 14, 2022, Joint Statement ¶ 11, and Plaintiff executed the agreement more than three months later on February 24, 2023, *id*. ¶ 14. While the Separation Agreement originally provided Plaintiff with 45 days to review and sign, Accenture extended the deadline "several times . . . at Mr. Lou's request while he discussed with Accenture several proposed changes to the Separation Agreement," *id*. ¶ 13, such that he ultimately had over 100 days to review the agreement, followed by seven days after signing it to reconsider and revoke, *id*. ¶ 33. It therefore makes sense that even Plaintiff "does not contend that he was pressed to review and execute the Agreement in an unreasonable short period of time." Dkt. No. 74 at 22.

The Court finds that this factor weighs in favor of a knowing and voluntary release, as the ample review period significantly mitigates the probability that Plaintiff's execution of the Separation Agreement was the product of a hasty and ill-considered review. *See, e.g.*, *Schuman*, 2023 WL 5498065 at *10 (finding 45 days sufficient), *Colaco v. Asic Advantage Simplified Emp. Pension Plan*, No. 5:13-CV-00972-PSG, 2015 WL 5655465 (N.D. Cal. Sept. 24, 2015) (same, even where some plaintiffs testified that they did not have adequate opportunity to review).

#### v. Plaintiff's Access to Independent Advice, Including from Counsel

There are no disputes of material fact regarding Plaintiff's access to counsel. The parties agree that Plaintiff received legal advice from counsel before executing the agreement. In fact, Plaintiff's testimony confirmed that he had the benefit of *two* lawyers at the time he executed the agreement: the employment attorney he had hired to look over the separation agreement and the counsel he retained for this lawsuit. Tr. 48:9–12. Accordingly, this factor also weighs in favor of finding a knowing and voluntary release. *See, e.g.*, *Upadhyay*, 2014 WL 186709 at *4 (citing plaintiff's consultation with her attorney as a factor supporting a knowing and voluntary waiver).

#### vi. Consideration for the Waiver

Finally, there are no disputes of material fact regarding "whether the consideration given in exchange for the waiver exceeds employee benefits to which [Plaintiff] was already entitled."

13

*Gonda*, 2015 WL 678969, at *3. The parties agree that Accenture "paid and provided Plaintiff all compensation called for under the Separation Agreement pursuant to the terms of the Separation Plan." Joint Statement ¶ 39. They also agree that the General Release stated, in pertinent part:

> As a material inducement to Accenture to enter into this Agreement **and as part of the consideration for the Separation Benefits offered to you, to which you agree you are not otherwise entitled**, you are expressly agreeing to the general release and waiver of claims . . . .

*Id*. ¶ 14 (emphasis added). Despite these undisputed facts, Plaintiff argues that this factor does not help Defendants because the consideration paid to Plaintiff was established by formula and was not increased to account for Plaintiff's released ERISA claims. Dkt. No. 74 at 21. But given the general nature of the release at issue, separate consideration for Plaintiff's ERISA claims is not necessary. *See Gonda*, 2015 WL 678969 at *9, citing *Bacon v. Stiefel Labs.*, Inc., No. 09–21871–CV–KLNG, 2011 WL 4944122, at *7 (S.D.Fla. Oct. 17, 2011) ("A number of courts . . . have held that . . . a release of ERISA claims which is included as part of a general release need not be separately bargained for or supported by separate consideration."). Regardless, Plaintiff has not established that he was entitled to *any* benefits had he not executed the Separation Agreement, and doing so would be an uphill argument given that by executing it, Plaintiff specifically agreed that he was not otherwise entitled to the Separation Benefits. Joint Statement ¶ 14. Accordingly, the Court finds that this final factor weighs in favor of finding a knowing and voluntary waiver.

\* \* \* \* \*

The Court therefore concludes that the totality of the circumstances indicate that Plaintiff knowingly and voluntarily released his ERISA claims against Accenture when he signed the Separation Agreement.

### B.     Application to the Plan and BCBSIL

Plaintiff contends that even if he released his claims against Accenture, any release cannot extend to the Plan and BCBSIL because the Separation Agreement does not reference them by name. Dkt. No. 74 at 15–16. The Court disagrees, and concludes that both entities qualify as "Released Parties."

The Separation Agreement broadly defines "Released Parties" in the General Release as "Accenture LLP, its parents, subsidiaries, divisions, affiliates, predecessors, successors and assigns, and all of their respective present and former directors, officers, partners, employees, representatives, fiduciaries, attorneys and agents."  Hrg. Ex. 7 at 11.  The Leadership Separation Benefits Plan further defines an "affiliate" as "an entity directly or indirectly controlling, controlled by, or under common control with, Accenture or any other entity in which Accenture or an Affiliate has an interest and which has been designated as an Affiliate by Accenture, in its sole discretion.  Hrg. Ex. 8 at 20.

Given that Accenture undisputedly sponsors the Plan, Joint Statement ¶ 5, the Court finds that the Plan is properly understood as an "affiliate" within the definition established in the Leadership Benefits Plan.  As the Summary Plan Document confirms, Accenture established the Plan, and is further "responsible for formulating and carrying out all rules and regulations necessary to administer the Plan and has the discretionary authority to make factual determinations and decisions regarding eligibility of employees and participants in the Plan."  Dkt. No. 56, Ex. C to the Declaration of Lisa Serebin in Support of Plaintiff's MSA ("Serebin Decl."), at 5.  The Court consequently concludes that the plain language of the Summary Plan Document establishes that the Plan is "directly or indirectly" controlled by Accenture.  While there is no precedential authority on the question of a release's applicability to the Plan administrator, the Court notes that courts in the Ninth Circuit and others have come to similar conclusions.  *See Austin v. CCC Info. Svcs., Inc. Benefit Plan*, 225 F. App'x 671, 672 (9th Cir. 2007) ("Because the Plan is an entity created and administered by [Plaintiff's] former employer, we conclude that the agreement's broad release clause clearly bars [Plaintiff's] ERISA action."); *Gonda*, 2015 WL 678969 at *9 ("While the Settlement Agreement specifies TPMG as one of the released parties, it does not mention the TPMG plan . . . Defendants argue that the TPMG Plan was released as an agent, representative, or related company . . . the broad language of the Settlement Agreement bars [Plaintiff's] ERISA action against the TPMG Plan."); *Sullivan v. Cap Gemini Ernst & Young U.S.*, 573 F. Supp. 2d 1009, 1021 (N.D. Ohio 2008) ("While [ERISA] undeniably establishes the plan's separate legal existence and its capacity to be sued, it does not answer . . . whether a release must explicitly refer

15

to an ERISA plan in order to be enforced against the plan. The Court agrees with *Goepfert* that it need not do so." (citing *Goepfert v. Trustmark Ins. Co.*, 541 F.Supp.2d 1052 (E.D. Wis. 2008))).

The Court further finds that BCBSIL, as the claims administrator of the PPO Plan offered by the Plan, is properly understood as a "fiduciary" of the Plan because it has discretionary authority to make final determinations about whether to pay or deny medical claims. *See Del Prete v. Magellan Behav. Health, Inc.*, 112 F. Supp. 3d 942, 945 (N.D. Cal. 2015) (discussing definition of ERISA fiduciaries); Dkt. No. 56, Ex. C to Serebin Decl., at 5 ("Benefits under the Plan will be paid only if the Plan Administrator (or its delegate) and/or Claims Administrator decides in its discretion that the claimant is entitled to them. Any decision made by Accenture or a Claims Administrator in good faith is final and binding on all persons."); Dkt. No. 55, Ex. B to Serebin Decl., at 53 (PPO Plan document describing claim administrator BCBSIL's authority to "determine whether a proposed admission, continued hospitalization or other health care service is a Covered Service under the Health Care Plan").  Since the general release defines "Released Parties" to include any representatives, "fiduciaries," or agents of released entities, like the Plan, and since BCBSIL is a fiduciary of the Plan, the General Release extended to Plaintiff's claims against BCBSIL.

\* \* \* \* \*

In sum, the Court finds that when Plaintiff signed the Separation Agreement, he released his ERISA claims against all named Defendants.  Accordingly, it need not reach the question of whether Plaintiff is entitled to PDN benefits for A.L.'s past and future care.[3]

### C. Applicability to Future Benefits

In the Opposition to Accenture's cross-motion for summary judgment, Plaintiff argues for the first time that "even if the Agreement encompassed Mr. Lou's ERISA benefit claims . . . by its

---

[3] Given this, the Court **TERMINATES AS MOOT** Plaintiff's Request for Judicial Notice.  Dkt. No. 59.  Though Plaintiff moves the Court to take judicial notice of a Department of Justice press release concerning a $25 million false claims settlement with BCBSIL, which "resolve[d] claims by the United States that BlueCross BlueShield of Illinois wrongly terminated insurance coverage for private duty skilled nursing care for medically fragile, technologically dependent children," the Court did not ultimately reach the substance of Plaintiff's ERISA claims.  Since the press release was inapplicable to the Court's consideration of the waiver question, the Court concludes that the Plaintiff's request for judicial notice of this material is moot.

16

own terms, it would only cover claims through the date of the document and not future claims." Dkt. No. 74 at 22–23. He cites no authority for the notion that the Court, having found Plaintiff's ERISA claims against all Defendants waived, could nonetheless entertain the provisions of Plaintiff's complaint that request clarification of Plaintiff's right to *future* benefits under 29 U.S.C. § 1132(a)(1)(B). The Court sees no justification for doing so. Plaintiff brought his ERISA claims against Defendants in May 2022, nearly a year before he signed the Separation Agreement in February 2023. Since the General Release extended to "all claims of any nature whatsoever" Plaintiff had up to and including the date of signing, Plaintiff released all of the ERISA claims underlying his lawsuit when he signed the agreement. That the requested relief for those claims included clarification of *future rights* under the terms of the Plan does not somehow change that the claims themselves pre-dated the Separation Agreement, and were waived.

## IV.  CONCLUSION

The Court **GRANTS** the Accenture Defendants' motion for judgment, Dkt. Nos. 68, and **DENIES** Plaintiff's motion, Dkt. No. 51. Because the Court finds that Plaintiff waived his ERISA claims against BCBSIL, it **TERMINATES AS MOOT** Defendant BCBSIL's motion, Dkt. No. 69, as well as Plaintiff's Request for Judicial Notice, Dkt. No. 59.

The Clerk is directed to enter judgment in favor of Defendants and to close the case. The parties should meet and confer regarding the filing and briefing schedule of any motion for attorneys' fees and costs.

**IT IS SO ORDERED.**

Dated:  3/14/2024

*Haywood S. Gilliam Jr.*
HAYWOOD S. GILLIAM, JR.
United States District Judge